IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANA SUAREZ, | ) | CASE NO. 1:14CV2319 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Ana Suarez ("Suarez") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

Suarez filed an application for DIB and SSI on December 13, 2011, alleging a disability onset date of December 31, 2009.  Tr. 19, 211, 218.  She alleged disability based on the following: stress, depression, anxiety, and hallucinations.  Tr. 256.  After denials by the state agency initially (Tr. 78, 79) and on reconsideration (Tr. 124, 125), Suarez requested an administrative hearing.  Tr. 161.  A hearing was held before Administrative Law Judge ("ALJ") Eric Westley on April 30, 2013.  Tr. 36-63.  In his May 10, 2013, decision (Tr. 19-29), the ALJ

determined that there are jobs that exist in significant numbers in the national economy that Suarez can perform, i.e., she is not disabled.  Tr. 27.  Suarez requested review of the ALJ's decision by the Appeals Council (Tr. 9) and, on August 29, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Suarez was born in 1966 and was 45 years old on the date her application was filed.  Tr. 27, 241.  She completed sixth grade in her native Puerto Rico and has a minimal ability to communicate in English.  Tr. 27, 255, 257.  She previously worked in a factory.  Tr. 257.  She last worked in November 2007.  Tr. 256.

### B.  Medical Evidence

**Mental:** On December 15, 2009, Suarez received counseling while incarcerated and discussed her problems getting along with others.  Tr. 359.  On February 10, 2010, after she was released, Suarez reported to a therapist at the Nord Center that she had not been doing well since leaving jail.  Tr. 355.  She stated that she had nowhere to live and that she needed medication to control her anxiety and depression.  Tr. 355.

On June 9, 2010, a therapist from the Nord Center accompanied Suarez to her consultative examination appointment to offer emotional support and to translate for her.  Tr. 339.  During the trip to the exam, Suarez discussed her problems with her ex-husband and stated that she was visiting a church so that she could get involved and forget about her problems.  Tr. 339.  She stated that she has a new boyfriend who is supportive and who is helping her financially.  Tr. 339.  The therapist noted that Suarez was cooperative during the exam and calmer afterwards.  Tr. 339.

Suarez continued to attend therapy sessions at the Nord Center and repeatedly reported that she was doing well on her medications when she was able to obtain them.  Tr. 351 (March 2010), 340, 341, 346, 348, 338 (June 2010).  She often discussed difficulties she had with her probation officer, living arrangements with friends and her daughters, finding a job, and her ex-husband.  Tr. 337-354.  She expressed an interest in working but was concerned how working would affect her eligibility for disability benefits.  Tr. 344-345.  She stated that work keeps her distracted from thinking about her problems and that she began to feel stressed after she stopped working and was away from her children.  Tr. 344.

Suarez continued to receive therapy and medication throughout 2010 and 2011.  Tr. 335, 547-549.  On February 28, 2012, she reported feeling more relaxed and less stressed but complained of continuing problems sleeping and concentrating.  Tr. 541.  On May 23, 2012, she reported that she had been off her medication for two months because she could not afford it and that her symptoms had returned.  Tr. 535-536.   She reported irritability, "very bad mood," depression, anger, poor frustration tolerance, and difficulty sleeping.  Tr. 535.

On July 31, 2012, Suarez reported feeling stressed and seeing shadows despite taking her medication.  Tr. 527.  The Nord Center therapist commented that the medication regimen had been successful in the past; Suarez's recent history of non-compliance made it difficult to reach the optimum dosage; that Suarez's complaints of seeing shadows may reflect malingering; and that her stress was circumstantial.  Tr. 527.

By August 27, 2012, Suarez was planning on moving in with her boyfriend (Tr. 517-519) and, on September 20, 2012, she reported that she was planning on visiting her family in Puerto Rico (Tr. 515-516).  She continued to report depressive symptoms due to physical problems she was having with her back.  Tr. 515.  On October 23, 2012, she again discussed her trip to Puerto

Rico and reported performing her activities of daily living independently.  Tr. 513.  Her therapist advised she "increase her chores as a way to keep [her] mind off" her daughter's medical problem.  Tr. 513.

**Back:** On January 11, 2012, Suarez presented to the hospital with complaints of intermittent lower back pain radiating to her abdomen.  Tr. 472.  A physical examination found all normal results.  Tr. 473.  She was diagnosed with abdominal pain and flank pain and discharged with medication for pain and nausea.  Tr. 482.

On January 17, 2012, Suarez returned to the hospital complaining of lower back pain radiating to her buttocks.  Tr. 454.  Her examination findings were again normal except for "paraspinous spasm lumbar 4, bilaterally, but no midline tenderness."  Tr. 454.  She was prescribed a muscle relaxant and pain medication.  Tr. 455.  Results of an x-ray of her lumbar spine taken few days later were normal.  Tr. 369.

On January 24, 2012, Suarez began seeing Evan Rae, D.O., at Lorain County Health and Dentistry.  Tr. 507-509.  She complained of lower back pain radiating down her right leg.  Tr. 507.  Upon examination, Suarez had increased spasms and tenderness to palpation in her lumbar spine at L1-5, increased pain with trunk extension, and a positive right leg straight raising test.  Tr. 509.  Dr. Rae diagnosed her with a lumbar strain and right-sided sciatica.  Tr. 510.

On February 9, 2012, Suarez went to the hospital complaining of back pain, body ache, shortness of breath, and a headache.  Tr. 428.  She reported low back pain radiating to her buttocks and posterior thighs.  Tr. 429.  Her pain was a 9/10 and she described the severity of her symptoms as moderate.  Tr. 428-429.  Upon physical examination, Suarez had diffuse lumbar spine tenderness, primarily in her paravertebral muscles and buttocks, but was otherwise normal.  Tr. 430.  An x-ray of her lumbar spine showed no acute findings but mild degenerative changes

4

at T12 and mild diffuse osteopenia.  Tr. 448.  She was diagnosed with a bulging disc in her lumbar spine with radiculopathy.  Tr. 428.  She was prescribed a steroid, pain medication, and a muscle relaxant.  Tr. 431.

At a follow-up visit with Dr. Rae on February 23, 2012, Suarez reported no improvement in her symptoms.  Tr. 504.  Dr. Rae's relevant examination findings were unchanged from her previous visit.  Tr. 505.  At Suarez's request, Dr. Rae referred her for pain management; Suarez declined physical therapy.  Tr. 503.

Suarez saw pain management specialist Sameh Yonan, M.D., for an evaluation on February 21, 2012.  Tr. 382.[1]  She complained of "constant moderately severe low back pain" that radiated to her buttocks, thighs, calves and knees, and also neck pain.  Tr. 382.  She described her back pain as "more like a spasm" and estimated her back pain level at 8/10.  Tr. 382.  She "admit[ed] to being depressed for all social issues."  Tr. 382.  On examination, Suarez had tenderness of her cervical facets at C4-5 and C5-6, pain with flexion and extension of her lumbar spine, but no spine tenderness.  Tr. 384.  Dr. Yonan diagnosed her with degeneration of lumbar or lumbosacral intervertebral disc; lumbago; sciatica; nerve root compression, lumbar; backache; lumbosacral sprain; and cervical spine sprain.  Tr. 385.  He also "suspect[ed] myofascial pain syndrome."  Tr. 385.  Dr. Yonan recommended physical therapy, prescribed medication, and scheduled an epidural lumbar spine injection.  Tr. 386.

On June 8, 2012, Suarez saw Dr. Rae for a preventative health visit.  Tr. 497-502.  Upon examination, she had a normal range of motion, muscle strength, and stability in all extremities with no pain.  Tr. 501.

---

[1]  Dr. Yonan's treatment note indicates that Suarez was referred to him by the hospital.  Doc. 382.

On August 6, 2012, Suarez saw Maryum Zohair, M.D., at Lorain County Health and Dentistry.  Tr. 568-570.  Suarez complained of constant back pain, 9/10.  Tr. 568.  She had not taken pain medication other than her friend's ibuprofen because she could not afford it, could not afford pain management, and could not afford physical therapy.  Tr. 568.  She had a limited range of motion in her spine due to pain.  Tr. 570.  She displayed an appropriate mood and affect.  Tr. 570.   On September 5, 2012, she was again referred for pain management services.  Tr. 559, 561.

On February 25, 2013, Suarez saw Girgis E. Girgis, D.O., for pain management.  Tr. 580-583.  She relayed her history of back pain radiating to her legs. Tr. 580.  She described her pain as aching, burning, pressure, pulsating, sharp and shooting and, at best, an 8/10 and at worst more than 10/10.  Tr. 580.  She reported that Vicodin "helped a little" and that she had the best relief when she took Vicodin and Percocet together.  Tr. 580, 583.

Upon physical examination, Suarez had a limited range of motion in her lumbar spine in all directions, tenderness over her lumbar facets and paraspinal muscles, and an antalgic gait.  Tr. 582.  She had normal muscle strength and reflexes.  Tr. 582.  She had severe bilateral thoracolumbar paraspinal muscle spasms.  Tr. 583.  Dr. Girgis noted that a spine x-ray taken in January 2013 was normal.  Tr. 583.  He diagnosed lumbago and lumbar radiculopathy.  Tr. 583.  He prescribed physical therapy and Vicodin, and added, "if conservative measures fail, will consider MRI lumbar spine."  Tr. 583.

On March 6, 2013, Dr. Girgis performed an epidural steroid injection on Suarez's lumbar spine.  Tr. 589.  She did "very well" with no apparent complications.  Tr. 590.

**D.  Medical Opinion Evidence**

**1.  Treating Source Opinion**

On February 21, 2012, the same day he saw Suarez for the first time for a pain management visit, Dr. Yonan completed a basic medical questionnaire on Suarez's behalf.  Tr. 577-579.  Dr. Yonan listed Suarez's medical conditions: lumbar disc degeneration; lumbago; sciatica; lumbar nerve compression; lumbosacral sprain and cervical sprain.  Tr. 577.  He opined that she was limited to sitting less than one hour in an 8-hour day and standing and walking less than one hour in an 8-hour day.  Tr. 579.  She could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds.  Tr. 579.  He opined that Suarez had moderate limitations in her ability to push, pull and reach, and marked limitations in her ability to bend.  Tr. 579.

### 2.  Consultative Examiners

On June 9, 2010, Suarez saw psychologist Richard Halas, MA, for a consultative examination.  Tr. 295-312.  Suarez reported that she attended school in Puerto Rico until she was in 6th grade and that her grandmother took her out of school because she was needed at home.  Tr. 295-296.  Math was her best subject and her grades were mostly average.  Tr. 296.  She told Dr. Halas that she was receiving outpatient treatment at the Nord Center for stress.  Tr. 296.

Dr. Halas observed that Suarez's "most unusual or concerning behavior was a flat affect and constricted presentation. She seemed quite limited at times."  Tr. 296-297.  Her psychomotor activity reflected retardation and she described her energy level as poor and below average.  Tr. 297.  Dr. Halas commented that she presented as dependent on others because she had been accompanied by her case worker from the Nord Center.  Tr. 296.  She had a depressed mood but was neat, well-kept, cooperative and appropriately motivated.  Tr. 296-297.  She spoke almost entirely in Spanish and the examination was conducted through an interpreter.  Tr. 297.  She

complained of feeling hopeless, helpless, and worthless.  Tr. 297.  She also reported severe problems sleeping.  Tr. 297.

Dr. Halas commented that Suarez displayed moderate levels of anxiety.  Tr. 297.  She was prone toward fidgeting and she rocked back and forth while seated.  Tr. 297.  She seemed apprehensive and anxious and bit her fingernails during the appointment. Tr. 297.  Her hands shook when extended in front of her.  Tr. 297.  Her mental content was within normal limits and her overall quality of consciousness was good.  Tr. 298.  Her memory for past events was good but her short-term memory was below average; she recalled one of three items after five minutes.  Tr. 298.  She could concentrate and recall five digits forward.  Tr. 298.  She could not do simple calculations or serial sevens.  Tr. 298.  She understood one of two simple proverbs.  Tr. 298.  Dr. Halas estimated her intelligence in the borderline range.  Tr. 298.  Suarez's insight and judgment were poor.  Tr. 298.

Suarez reported that she shared all household chores with her daughter, enjoyed watching television and going for walks, and had few friends.  Tr. 298.  She stated that she was "uncertain as to what might keep her from working at this time."  Tr. 298.

Dr. Halas performed intellectual testing and Suarez scored in the extremely low range, with the exception of perceptual reasoning, which was in the borderline range.  Tr. 298.  Her overall IQ score was 61, which is in the .5 percentile of the general population.  Tr. 298.  She was significantly below average in her ability to work in a rapid and accurate manner.  Tr. 299.  Her memory skills were also extremely low.  Tr. 299.  Dr. Halas indicated that the consistency of her low scores in specific areas indicated that the scores were a valid and accurate measure of her true overall long-term functioning and academic potentialities.  Tr. 299.  He observed that her

scores seemed consistent with her previous academic background and apparent life functioning levels.  Tr. 299.

Dr. Halas diagnosed Suarez with generalized anxiety disorder, depressive disorder, borderline personality disorder with anti-social features, and poly-substance abuse in remission. Tr. 299-300.  He also diagnosed her with borderline intellectual functioning per V62.89 in the Diagnostic Statistical Manual of Mental Disorders ("DSM-IV") and found that she did not meet the B criteria for mild mental retardation.  Tr. 300.  Dr. Halas opined that Suarez had marked impairments in: understanding, remembering, and following instructions; maintaining attention and concentration to perform simple, repetitive tasks; relating to others; and withstanding the stresses and pressures associated with most day-to-day activities, such that she was likely to deteriorate quickly under normal work pressures.  Tr. 300.

On February 27, 2012, Suarez saw psychologist Thomas Zeck, Ph.D., for a consultative examination. Tr. 388-394.  A friend accompanied Suarez to act as an interpreter.  Tr. 388.  Dr. Zeck noted, "[Suarez] completed her information sheet in Spanish.  It was quite difficult to carry out this interview."  Tr. 388.

Suarez said that she could not work because her nerves are bad, she does not like to be around people, she has crying spells, she has no one to care for her medical needs, and she has "memory issues."  Tr. 388.   She felt alone, helpless and hopeless.  Tr. 391.  She displayed no motor or autonomic signs of anxiety.  Tr. 391.  She denied hallucinations.  Tr. 391.  She made minimal or no effort on testing, became teary, and appeared to want to cease participating.  Tr. 391.

Suarez reported that she helps around the house when she can, including washing laundry, vacuuming, dusting, and straightening up.  Tr. 391.  Dr. Zeck noted, "She seemingly

9

does not do much of anything." Tr. 391. Dr. Zeck summarized his evaluation by reiterating that his interview with Suarez was very difficult primarily due to the language barrier. Tr. 392. He diagnosed major depressive disorder and assigned a Global Assessment of Functioning ("GAF") score of 51.[2] Tr. 392.

Dr. Zeck opined that Suarez's ability to understand, remember, and carry out instructions was significantly impaired; that her persistence and pace were "rather poor"; and that she would have problems with multi-step tasks. Tr. 392. He determined that she would have a difficult time relating to others due to language problems and that her depression would detract from her ability to relate. Tr. 392. She would have a difficult time dealing with work pressures and comprehending and functioning appropriately. Tr. 394.

### 3. State Agency Reviewers

**Mental:** On March 10, 2012, state agency psychologist Kristen Haskins, Psy.D., reviewed Suarez's file, including Suarez's function report that Suarez filled out in Spanish. Tr. 81-87. Regarding the B criteria of Listing 12.04, Affective Disorders, Dr. Haskins found that Suarez had mild restrictions in activities of daily living, moderate restrictions in social functioning and maintaining concentration, persistence, and pace, and no episodes of decompensation. Tr. 83. Regarding Suarez's mental residual functional capacity ("RFC"), Dr. Haskins opined that Suarez was capable of "simple and likely a variety of multi-step tasks when her emotions are stable; will do better in a setting where Spanish is spoken." Tr. 85. She is able to complete tasks in a setting that does not require close sustained focus or attention or a sustained fast pace. Tr. 86. She should avoid contact with the general public, have no stringent

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

time or production requirements, and appeared to be capable of adapting to static routine changes.  Tr. 86-87.

On July 19, 2012, state agency psychologist Leslie Rudy, Ph.D., affirmed Dr. Haskins' opinion.  Tr. 102-105.

**Physical**: On July 20, 2012, state agency physician Steve E. McKee, M.D., reviewed Suarez's file.  Tr. 105-106.   Regarding Suarez's physical RFC, Dr. McKee opined that Suarez can occasionally lift 50 pounds, frequently lift 25 pounds, and can sit, stand and/or walk for six hours in an eight-hour workday. Tr. 105.

### E.  Testimonial Evidence

#### 1.  Suarez's Testimony

Suarez was represented by counsel and testified at the administrative hearing through an interpreter.  Tr. 36-57.  She is single and lives alone.  Tr. 42-43.  She has four adult children whom she sees and talks to on the phone.  Tr. 42-43.  She attended school up to sixth grade in her native Puerto Rico until her grandmother took her out of school.  Tr. 42.  She is able to read and write in Spanish.  Tr. 47.  She cannot read or write in English.  Tr. 45.  She understands a "little bit" of English but does not speak it.  Tr. 45.  She has not taken English classes.  Tr. 45.

Suarez testified that she previously worked in a paper factory.  Tr. 43.  She took the paper out of the machine and packed it in boxes.  Tr. 43.  She stopped working there when the factory moved to its other location; because she does not drive or have a ride, she could not travel to the new location.  Tr. 43.  She performed that job with no problems.  Tr. 44.  She tried to find a job after that but stated that it was difficult for her to get hired because she had been in jail.  Tr. 44.

Prior to the paper factory, Suarez worked in a plastics factory cutting plastic with a razor. Tr. 44.  She also worked in a battery factory cleaning and assembling parts.  Tr. 56-57.  Her last

job was in construction; she passed stones, blocks and mixes for the other workers.  Tr. 45.  She left that job because immigration picked up the man she worked for and because she started having spine problems.  Tr. 45.

Regarding her back pain, Suarez testified that her pain "comes from the upper side to the lower sides and it [] swells."  Tr. 46.  She also has pain in her right knee and left ankle.  Tr. 46.  She received pain medication from her doctors such as Percocet and ibuprofen, which alleviate the pain but does not make the pain go away.  Tr. 46.  Her pain is constant.  Tr. 46.

Regarding her therapy at the Nord Center, an interpreter is present for her sessions.  Tr. 50.  During her therapy she and her therapist "only talk."  Tr. 50.  Suarez gets pills for her depression and to sleep and be relaxed.  Tr. 47.  Sometimes she sleeps well at night but sometimes she does not.  Tr. 47.  When she takes her sleeping pills she sometimes is only able to fall asleep late at night or not at all.  Tr. 47.  When she is depressed, she takes her medication and eventually becomes relaxed.  Tr. 47.  If she does not take her pill, she starts "thinking things that I wouldn't have to think about."  Tr. 47.  She testified that she remembers to take her medication on time.  Tr. 49.  She also stated that she sometimes has to tell her friends to remind her "because sometimes I tend to forget everything."  Tr. 49.  A friend also reminds her where she puts things.  Tr. 49-50.

Suarez testified that she does not have a driver's license.  Tr. 48.  She tried to get one but, while she had her temporary license, "without a fault I hit a boy on a bicycle, so the[y] blame it on the apprentice license and they took it away from me."  Tr. 48.  She is able to lift "barely" a gallon of milk.  Tr. 48.  She cannot hold it for very long and sometimes she drops it.  Tr. 48.  She can stand "only for a little while because sometimes since my back hurts a lot, I cannot even be standing up or either sit down.  I have to lie down because the back hurts a lot."  Tr. 48.  She has

difficulty sitting in a chair.  Tr. 48.  She experiences back pain "right in the middle bone" and in her buttocks.  Tr. 49.  She takes a pill for her pain but she can only take the pill once a day.  Tr. 49.  Sometimes, when she feels a lot of pain, she takes her pill twice a day.  Tr. 49.  When she washes dishes or sweeps, she has to sit back and relax afterwards because of her back pain.  Tr. 50.

Suarez testified that she has difficulty getting along with other people.  Tr. 49.  She stated, "I get along with them by talking to them.  I getting along with them okay without any discussion or anything."  Tr. 49.

### 2. Vocational Expert's Testimony

Vocational Expert Deborah Lee ("VE") testified at the hearing.  Tr. 50-63.  The ALJ discussed with the VE Suarez's past relevant work as a hand packager, injection mold machine tender, construction worker, and small parts assembler.  Tr. 51-58.  The ALJ asked the VE to determine whether a hypothetical individual of Suarez's age, education and work experience, including her ability or inability to speak English, could perform the jobs she performed in the past if that person had the following characteristics: cannot understand, remember, or carry out detailed instructions; cannot work at a production pace but can perform goal oriented work; cannot interact with the public; and can tolerate occasional changes to the routine work setting so long as the changes are adequately explained.  Tr. 59.  The VE answered that such an individual could not perform Suarez's past work because Suarez's past jobs were in a manufacturing setting with some degree of production pace.  Tr. 59.   The ALJ asked the VE if there were any jobs that such an individual could perform.  Tr. 59.  The VE stated that such an individual could perform jobs as a kitchen helper (5,800 northeast Ohio jobs; 17,000 Ohio jobs; 509,000 national

jobs); cook helper (10,000 northeast Ohio jobs; 32,000 Ohio jobs; 873,000 national jobs); and

cleaner (9,100 northeast Ohio jobs; 29,000 Ohio jobs; 915,000 national jobs).  Tr. 59-60.

Next, the ALJ asked the VE whether the same hypothetical individual could perform the

jobs identified by the VE and any other jobs if the individual had the following additional

limitations: the individual is limited to medium work, i.e., can lift or carry 50 pounds

occasionally and 25 pounds frequently, stand or walk six hours out of eight, and sit for six hours

out of eight.  Tr. 60.  The VE affirmed that such an individual could perform the jobs previously

identified by the VE.  Tr. 60.  The ALJ then asked the VE whether the hypothetical individual

described could perform the jobs identified by the VE and any other jobs if the individual were

limited to performing light work rather than medium work.  Tr. 60.  The VE answered that such

an individual could still perform the job of cleaner, with reduced numbers at the light level

(4,000 northeast Ohio jobs; 13,000 Ohio jobs; 403,000 national jobs).  The individual could also

perform jobs as a cafeteria attendant (1,400 northeast Ohio jobs; 3,900 Ohio jobs; 97,000

national jobs) and laundry worker (1,300 northeast Ohio jobs; 4,400 Ohio jobs; 109,000 national

jobs).  Tr. 61.  Lastly, the VE asked whether the hypothetical individual could perform Suarez's

past work if the individual was limited to sedentary work.  Tr. 61.  The VE replied that such an

individual could not perform Suarez's past work.  Tr. 61.

Next, Suarez's attorney asked the VE to consider whether the ALJ's first hypothetical

individual with mental limitations could perform the jobs previously identified by the VE if that

individual had the following additional limitations: the individual would require a sit/stand

option and could not stand or sit for more than one hour at a time.  Tr. 61-62.  The VE answered

that such an individual could not perform any of the first jobs identified by the VE.  Tr. 62.

Suarez's attorney asked the VE what jobs would remain if the hypothetical individual was

14

limited to medium work but with the same sit/stand option.  Tr. 62.  The VE answered that such

an individual could not perform the jobs previously identified by the VE.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must
    be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a
    severe impairment that has lasted or is expected to last for a continuous
    period of at least twelve months, and his impairment meets or equals a
    listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ
    must assess the claimant's residual functional capacity and use it to
    determine if claimant's impairment prevents him from doing past relevant
    work.  If claimant's impairment does not prevent him from doing his past
    relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his May 10, 2013, decision, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 21, 2012.  Tr. 21.

2.     The claimant has not engaged in substantial gainful activity since December 31, 2009, the alleged onset date.  Tr. 21.

3.     The claimant had the following severe impairments through January 20, 2012: affective disorders.  Tr. 21.

4.     The claimant has the following severe impairments from January 21, 2012: affective disorders and spine disorders.  Tr. 22.

5.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 22.

6.     The claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations through January 20, 2012: precluded from understanding, remembering, or carrying out detailed or complex instructions; precluded from work at a production pace but able to perform goal-oriented work;

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

precluded from interacting with the public; able to tolerate occasional changes to routine work settings with changes which must be adequately explained.  Tr. 23.

7.  From January 21, 2012, the claimant has had the residual functional capacity to perform medium work as defined in 20 CFR 404.1527(c) and 416.967(c), with the ability to lift or carry 50 pounds occasionally and 25 pounds frequently; the ability to stand or walk 6 hours out of 8; the ability to sit 6 hours out of 8; precluded from understanding, remembering, or carrying out detailed or complex instructions; precluded from work at a production pace but able to perform goal-oriented work; precluded from interacting with the public; able to tolerate occasional changes to routine work settings with changes which must be adequately explained.  Tr. 25.

8.  The claimant is unable to perform any past relevant work.  Tr. 27.

9.  The claimant was born on November 6, 1966 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 27.

10.  The claimant has a marginal education and has a minimal ability to communicate in English.  Tr. 27.

11.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.  Tr. 27.

12.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 27.

13.  The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2009, through the date of this decision. Tr. 28.

## V. Parties' Arguments

Suarez objects to the ALJ's decision on three grounds.  She argues that the ALJ did not properly evaluate Suarez's credibility and whether she met or equaled Listing 12.05; that substantial evidence does not support the ALJ's finding that Suarez did not meet or equal Listing 12.05; and that the ALJ's RFC assessment does not accurately portray her functional limitations, rendering the ALJ's hypothetical to the VE faulty.  Doc. 12, p. 2.  In response, the Commissioner

submits that substantial evidence supports the ALJ's decision and that he properly followed the guidelines in reaching his determination.  Doc. 14, pp. 9-15.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam)* (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ followed the guidelines in assessing Suarez's credibility

Suarez argues that the ALJ did not follow the guidelines in assessing her credibility because the ALJ's credibility finding was not based on the record as a whole.  Doc. 12, p. 14.

A disability claim can be supported by a claimant's subjective complaints as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003).  "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)).  To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used.  20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th

18

Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Id*.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id*. The ALJ should consider the following factors in evaluating a claimant's symptoms:

> 1) the individual's daily activities;
> 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3) factors that precipitate and aggravate the symptoms;
> 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*.; *see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Jones*, 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make

obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); SSR 96-7p, 1996 WL 374186, *2.

Suarez criticizes the ALJ's analysis because, regarding her mental impairments, "the only factor he considered was [Suarez's] activities of daily living" and not all the factors enumerated above.  Doc. 12, p. 14.  The undersigned disagrees.  The ALJ also considered treatment Suarez received, noting that she did well on medication.  Tr. 24.  *See* SSR 96-7p.  He also observed that she reported feeling well in August 2011, had expressed an interest in working but was concerned about how working would affect her eligibility for benefits, and that she stated that she had "a quick temper all of her life."  Tr. 24.  He noted that she has a past work history that includes earnings as high as $20,317.26 in 2004.  Tr. 22.  It cannot be said, therefore, that the ALJ only considered Suarez's activities of daily living.  Moreover, Suarez does not identify evidence in the record that the ALJ should have but did not consider per the regulations.

Instead, Suarez criticizes the ALJ's reliance upon the opinion of state agency reviewing psychologist Dr. Haskins because Dr. Haskins "relied upon a translation of [Suarez's] answers to a Functional Questionnaire."  Doc. 12, p. 14.  Suarez states, "the English translation was not in the record, was not available to Plaintiff and, therefore, was improperly relied on."  Doc. 12, p. 14.  That an English translation is not in the record does not make it unavailable to Suarez since she filled out the form (Tr. 266-273) and testified that she cannot read English; Suarez would not be aided by an English translation.  An English translation in the record was furthermore not needed by her attorney because, again, Suarez filled out the form and could explain to her attorney what she wrote in the form.  Indeed, Suarez next argues that the ALJ took her examples of daily activities expressed in her function report "out of context" or that they were "offset by

other examples in the record."  Doc. 12, p. 14.  She provides no explanation for what, specifically, was taken out of context and appears to have a firm grasp of what she wrote in her function report in order to assert that her answers were "offset by other examples in the record." Notably, Suarez only complains that she was not provided an English translation of her answers; she does not argue that her answers as characterized by Dr. Haskins and the ALJ were erroneous due to a faulty translation.

Suarez also argues that the ALJ took evidence "out of context" because he cited evidence that Suarez reported doing well on her medication on June 14, 2010, but that, "just five days earlier she was anxious, had a blunt affect and was not eating well.  In addition, six days earlier, she was depressed."  Doc. 15, p. 3.  While it is true that, on June 8, 2010, Suarez stated that she was "depressed due to bad communication with my P.O.," she also stated that day, "I feel better with my meds."  Tr. 340.  Moreover, on August 26, 2010, at a home visit, she had a blunted affect but stated, "I feel O.K. today" and "I feel well with my meds."  Tr. 340.  She was talkative and cooperative and her house was clean and organized.  Tr. 340.  Her anxiousness on June 9, 2010, was due to her consultative examination; the treatment note describes that she was calmer after the examination and responded to the therapist calming her prior to the examination by offering support.  Tr. 339.  None of this evidence changes the fact that Suarez repeatedly reported feeling better on her medication; indeed, the record reflects that, for a brief period, she was off her medications and felt worse.  *See* Tr. 535, 527.  Thus, it cannot be said, as Suarez asserts, that the ALJ "selectively chose evidence to support his conclusion while ignoring the evidence as a whole."  Doc. 15, p. 3.

In sum, the ALJ followed the guidelines in assessing Suarez's credibility and substantial evidence supports his decision.[4]

### B. The ALJ did not err in his RFC assessment and his hypothetical question to the VE adequately portrayed Suarez's limitations

Suarez argues that the ALJ committed error when he failed to include in his RFC assessment "the fact that Ms. Suarez could not effectively communicate in English nor . . . read or write the English language and was, therefore, basically illiterate."  Doc. 12, p. 17.  She also asserts that the ALJ failed to include these functional limitations in his hypothetical to the VE and, accordingly, the VE's testimony cannot support the ALJ's decision.  Doc. 12, p. 15.  Again, the undersigned disagrees.

20 CFR § 404.1564(b)(5) provides,

> Inability to communicate in English. Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor. Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in.

20 CFR § 404.1564(b)(5).  The ALJ found that Suarez had a marginal education and a minimal ability to communicate in English.  Tr. 27.  He did not find, nor does the record support, that Suarez is illiterate.  *See, e.g*., Tr. 266-273 (function report filled out by Suarez in Spanish); Tr. 47 (Suarez testifying at the hearing that she can speak and read Spanish); 20 CFR § 404.1564(b)(1)

---

[4]  Suarez appears to challenge the ALJ's credibility assessment only with respect to her mental limitations.  *See* Doc. 12, p. 14 (arguing that the ALJ's reliance upon Suarez's activities of daily living was flawed, asserting, "Nothing in the record suggests that she did these activities on a sustained basis which is how the functional limitations of mental impairments are to be assessed." ).  Although Suarez generally asserts that the ALJ failed to evaluate all the factors when assessing her credibility, "including the location, duration, frequency and intensity of her pain and depression," she does not point to evidence that the ALJ improperly relied on or that the ALJ should have relied on with respect to her back pain.  Accordingly, the undersigned does not consider the ALJ's credibility assessment with respect to her physical impairment.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

("Illiteracy means the inability to read or write."); 20 CFR § 404.1564(b)(2) ("Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled type jobs.  We generally consider that formal schooling at a 6th grade level or less is a marginal education.").  Essentially, Suarez urges the Court to equate the inability to communicate in English with illiteracy.  The regulations do not support such a determination in light of the separate categories provided for illiteracy and the inability to communicate in English.

The ALJ's RFC assessment precluded Suarez from work that involved an ability to understand, remember, or carry out detailed or complex instructions, work at a production pace, and interact with the public; he also provided that she could tolerate occasional changes to routine work settings provided the changes are adequately explained.  Tr. 25.  Suarez does not argue that these limitations do not account for her minimal ability to communicate in English or what further limitations she should have been assessed.

Moreover, the ALJ's hypothetical to the VE included a description of an individual of Suarez's age, education, including "her ability or inability to speak English," and past relevant work.  Tr. 59.  The VE identified jobs that such an individual could perform.  Tr. 59-61.  Suarez's assertion that the ALJ failed to account for her English language skills in the hypothetical question to the VE is, therefore, not well taken.

Suarez also argues that the ALJ's RFC assessment that she could perform work at the medium exertional level is not supported by substantial evidence.  In support, she relies on the opinion of Dr. Yonan, who treated her one time and, on that same day, completed a form opining that Suarez cannot stand or sit for more than one hour in an eight-hour day.  Doc. 12, p. 17.  The ALJ gave little weight to Dr. Yonan's opinion because of the "minimal findings and minimal

treatment" in the record that would support his opinion (Tr. 26), which Suarez does not

challenge.  She also argues that the opinion of state agency reviewer Dr. McKee "could not serve

as substantial evidence to support the conclusion that Ms. Suarez was capable of any sustained

work"  because Dr. McKee's opinion was rendered prior to Suarez's visit with Dr. Girgis, which

occurred two months before the hearing date.  Doc. 12, p. 18.  However, an ALJ, not a medical

source, is responsible for "evaluating the medical evidence and the claimant's testimony to form

an assessment of [her RFC]."  *Webb. v. Comm'r of Soc. Sec*., 368 F.3d 629, 633 (6th Cir. 2004)

(quoting 20 CFR §416.920(a)(4)(iv)); *see also* 20 CFR § 404.1546(c) ("the administrative law

judge ... is responsible for assessing your residual functional capacity.").

 Suarez concedes that the ALJ is not required to adopt any one medical opinion source

over another, but asserts that "there has to be some evidence, and the ALJ had none beginning

with 2012."  Doc. 15, p. 7.  This assertion is not supported by the record; there is evidence of

Suarez's back problems in the record.  That the record does not contain a medical opinion dated

after Suarez saw Dr. Girgis two months before the hearing is not fatal to the ALJ's finding;

treatment notes from Suarez's visits with Dr. Girgis are in the record, *see* Tr. 580-590, and the

ALJ referenced these treatment notes and Suarez's epidural steroid injection.  Tr. 26.  Suarez

does not explain what further limitations Dr. Girgis' treatment notes would support.  Notably,

Dr. Girgis observed that a recent x-ray of Suarez's spine was normal and prescribed conservative

treatment, including pain medication, which Suarez stated had worked well in the past.  Tr. 583.

 Lastly, Suarez argues that the ALJ should have requested a consultative examination to

establish the functional limitations of her back impairments.  Doc. 12, p. 18.  She cites no case

law in support of her argument that the failure of the ALJ to order a consultative examination is

reversible error.  Rather, the ALJ may, but is not required to, refer a claimant for a consultative

examination.  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).

In sum, the ALJ complied with the regulations in assessing Suarez's RFC and his RFC

assessment is supported by substantial evidence.

### C. The ALJ did not err when he found that Suarez did not meet Listing 12.05

Suarez argues that the ALJ erred at Step Three when he found that Suarez did not meet

Listing 12.05, Intellectual Disability.  Doc. 12, p. 18.  She asserts that the ALJ failed to apply the

proper legal standard when assessing her mental limitations.  Doc. 12, p. 18.

Listing 12.05 provides,

Intellectual disability: Intellectual disability refers to significantly subaverage general
intellectual functioning with deficits in adaptive functioning initially manifested during
the developmental period; i.e., the evidence demonstrates or supports onset of the
impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C,
or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs
(e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such
that the use of standardized measures of intellectual functioning is precluded; or

B. A valid verbal, performance, or full scale IQ of 59 or less; or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
other mental impairment imposing an additional and significant work-related
limitation of function; or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at
least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace;
or
4. Repeated episodes of decompensation, each of extended duration.

20 CFR Pt. 404, Subpt. P, App. 1, Listing 12.05.

Suarez cannot show that she meets Listing 12.05.  She does not assert that she has deficits in adaptive functioning that initially manifested before she turned 22 and the record contains no such evidence.  *See Foster*, 279 F.3d at 354-355 ("A claimant must demonstrate that her impairment satisfies the diagnostic description for the listed impairment in order to be found disabled[,]" including that the condition manifested itself before age 22).  Thus, she does not meet the requirements for Listing 12.05 and the ALJ did not commit error in finding that she did not meet Listing 12.05.

Suarez argues that the fact that Dr. Halas diagnosed her with borderline intellectual functioning was "irrelevant" to the determination of whether she met the criteria of mental retardation.  Doc. 12, p. 19.  Thus, she asserts, the ALJ's reference to Dr. Halas' diagnosis of borderline intellectual functioning was erroneous; she cites to *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. App'x 533 (6th Cir. Jan. 21, 2014), in support of her argument.  Doc. 12, p. 19. *Peterson* does not support Suarez's argument.  *Id*. at 539 (evidence in the record, including two examining psychologist opinions, that claimant had borderline intellectual functioning, not mild mental retardation, supported the ALJ's conclusion that the claimant did not meet Listing 12.05).

Suarez next asserts that the ALJ used the wrong criteria because there is no B criteria in Listing 12.05.  Doc. 12, p. 19.  The ALJ did not use the B criteria when discussing Listing 12.05; the ALJ referenced the B criteria when discussing Dr. Halas' opinion wherein Dr. Halas diagnosed Suarez with borderline intellectual functioning and noted that Suarez did not meet the "B criterion for Mild Mental Retardation."  Tr. 22, 300.  Defendant points out that there is a "B criterion" found in the Diagnostic Statistical Manual for mental retardation.  Doc. 14, p. 10; *see* American Psychiatric Association, DSM-IV-TR, at 41-49 (4th ed. 2000).  Suarez rejoins that Defendant's assertion is improper *post hoc* rationalization.  Doc. 15, p. 8.  She claims that the

26

ALJ did not know what Dr. Halas was referring to and, even if the ALJ did know that Dr. Halas was referring to the DSM-IV-TR, the DSM-IV-TR is not evidence in the record and the ALJ should not have relied on it.  Doc. 15, p. 8.  She also contends that she and her attorney were not advised that the ALJ would rely on such evidence and the failure of the ALJ to advise them that he would rely on it deprived Suarez of her due process rights.  Doc. 15, p. 8.

First, the ALJ did not commit error because a consultative examiner referenced the DSM-IV-TR in his opinion.  Second, Dr. Halas' opinion clearly referred to the DSM-IV-TR (Tr. 300); thus, it cannot be said that Suarez's attorney was not aware that Dr. Halas' opinion referenced the DSM-IV-TR.  Finally, as described above, Suarez cannot, and does not, allege that she can meet the requirements of Listing 12.05.  Accordingly, her arguments are without merit.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED.**

Dated: September 18, 2015

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)